**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| The United States of America, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| v. | : | |
| | : | |
| Carahsoft Technology Corp., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

## DECLARATION OF SAMSON O. ASIYANBI IN SUPPORT OF THE UNITED STATES' PETITION TO ENFORCE CIVIL INVESTIGATIVE DEMAND NO. 22-498

I, Samson O. Asiyanbi, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a Trial Attorney in the Civil Division of the Department of Justice and, along with Trial Attorney Vincent J. Vaccarella and Assistant United States Attorney Matthew Haven of the District of Maryland, have been assigned to work on this matter. I make this declaration in support of the United States' petition to enforce compliance with Civil Investigative Demand (CID) No. 22-498, issued to Carahsoft Technology Corp. (Carahsoft).

2. In this matter, the United States has neither "commenc[ed] a civil proceeding" nor "ma[de] an election" under the False Claims Act (FCA). *See* 31 U.S.C. § 3733(a)(1).

3. On May 6, 2022, the Department of Justice (DOJ) issued CID No. 22-498 pursuant to the FCA. Attached hereto as Exhibit 1 is a true and correct copy of the CID package, including Email from S. Asiyanbi, Trial Attorney, DOJ, Fraud Section, to R. Conway, Counsel for Carahsoft (June 1, 2022), attached hereto as Exhibit 1-A; CID No. 22-498, attached hereto as Exhibit 1-B; Specifications for Production of Electronically Stored Information and Digitized Images

(hereinafter ESI Instructions), attached hereto as Exhibit 1-C.

4. Section 3733(i)(1) of the FCA requires the designation of "a false claims law investigator to serve as a custodian of documentary material" and "answers to interrogatories" for the CID. *See* 37 U.S.C. §. 3733(i)(1). In compliance with this provision, I am identified on CID No. 22-498 as one of the "designated . . . False Claims Act custodians." (*See* Ex. 1-B, at 1.)

5. On June 1, 2022, Attorney Richard Conway of the law firm of Blank Rome LLP confirmed by email that he has "been authorized by Carahsoft to accept service of the CID [that the DOJ] wish to serve on Carahsoft." *See* Email from R. Conway, Counsel for Carahsoft, to S. Asiyanbi, Trial Attorney, DOJ, Fraud Section (June 1, 2022), attached hereto as Exhibit 2. On the same day, and in reliance on the representation by Mr. Conway, CID No. 22-498 was delivered by email to Mr. Conway at richard.conway@blankrome.com. (Ex. 1-A.)

6. CID No. 22-498 was issued "in the course of a False Claims Act Investigation" concerning "whether ▮ its affiliates, and various resellers, including Carahsoft Technology Corp., conspired to make, made, or caused to be made false claims to the Department of Defense by coordinating the bids, prices, and/or market for ▮ software, cloud storage, and related hardware and services." (Ex. 1-B, at 1.) The CID has four attachments: (a) Definitions, (b) Instructions, (c) Interrogatories, and (d) Document Requests. *Id.*

7. Attachment A contains the definitions for "Communication[s]" and "Documents," as used in the CID. It states that both terms are "used in the broadest sense permitted by the Federal Rule of Civil Procedure 26(b), 34(a) and 45(a)." (*See* Ex. 1-B, Attach. A, ¶¶ 2-3, at 6.)

8. Attachment B contains several instructions, including one that requires Carahsoft to "produce imaged hard copy and electronic documents according to the attached [ESI Instructions]." (*See* Ex. 1-B, Attach. B, ¶ 10, at 9.) The ESI Instructions were included in the CID

delivered by email to Mr. Conway on June 1. (*See* Ex. 1-C.)

9. I or one of my colleagues also re-sent the ESI Instructions to Carahsoft on four other occasions—on July 5, 2022, August 2, 2022, October 24, 2022, and October 31, 2022—in seeking Carahsoft's compliance with its CID obligations.

10. Attachment C contains 13 interrogatories. (*See* Ex. 1-B, Attach. C., at 10-11.) Carahsoft was required to answer each interrogatory "separately and fully in writing under oath" and then "submi[t] [written responses] no later than twenty (20) days from the receipt" of the CID. *Id.* at 1-2. Carahsoft's written interrogatory responses were due by June 21, 2022 or at "another time . . . [that is] mutually agreed upon." *Id.*

11. Under the FCA, "[e]ach interrogatory . . . shall be answered separately and fully in writing under oath and shall be submitted under a sworn certificate, in such form as the demand designates." 31 U.S.C. § 3733(g). As such, the CID included a form "Certificate of Compliance" in which the respondent must swear "under the penalty of perjury that the [their] interrogatory responses are true and correct." (*See* Ex. 1-B, at 4.)

12. Attachment D contains 18 requests for documents. (*See* Ex. 1-B, Attach. D, at 11-13.) "These documents shall be produced no later than thirty (30) days from the receipt of" the CID. *Id.* at 1. Carahsoft's documents were due by July 1, 2022 or "at another time . . . [that is] mutually agreed upon." *Id.*

13. Under the FCA, "[t]he production of documentary material in response to a [CID] . . . shall be made under a sworn certificate, in such form as the demand designates." 31 U.S.C. § 3733(f)(1). The CID also included a form "Certificate of Compliance" that "all the materials required by the [CID] which are in the possession, custody or control of the person to whom the Demand is directed have been submitted." (Ex. 1-B, at 3.) A sworn certificate was due with

Carahsoft's compliance with the CID.

14. As set forth below, Carahsoft has confirmed that it has in its possession, custody, control, or knowledge documentary materials and information that are relevant to the United States' FCA investigation.

15. As set forth below, the United States has reason to believe that Carahsoft is in possession, custody, control, or knowledge of other documentary materials and information, in addition to those independently confirmed by Carahsoft in paragraph 14, that are also relevant to the United States' FCA investigation.

16. The documents and information sought by CID No. 22-498 are reasonably relevant to the United States' investigation under the FCA, and the CID is not unreasonably broad or unduly burdensome.

17. The United States issued CID No. 22-498 for a proper purpose, which is to obtain documents and information relevant to its FCA investigation. The United States did not issue the CID for any improper purpose.

18. To date, Carahsoft has not produced any email communications and has produced very few of the other documents that are relevant to the FCA investigation and are responsive to its CID. Also, Carahsoft has not responded to any of the interrogatories in the CID. Carahsoft did not ask for, and the United States did not agree to, an indefinite extension of the deadlines to respond to the CID.

***Carahsoft***

19. Carahsoft is a "Government IT Solution Provider," who distributes technology solutions to other direct resellers or directly sells the technology solutions to federal government agencies. *See* https://www.carahsoft.com/. The technology solutions are manufactured by various

companies, such as ▆ who authorize Carahsoft to distribute or resell their products and services. In this matter, Carahsoft was an authorized distributor or reseller or both for ▆ during the time period covered by CID No. 22-498.

20.     In furtherance of its roles as both a distributor and reseller, Carahsoft communicated frequently with ▆ and its affiliates, and this relationship resulted in Carahsoft generating, receiving, and transmitting records relating to the sale of their technology solutions to the Department of Defense (DoD).  *See generally*, Carahsoft, Public Sector Markets We Serve, https://www.carahsoft.com/markets ("Carahsoft proactively markets, sells and distributes leading IT solutions for public sector markets in the U.S.") (last visited July 19, 2023).

21.     Carahsoft used the information obtained from its communications with ▆ and its affiliates to, among other things, formulate resale or distributor prices, to transmit proposals, and to provide terms and conditions, which are then submitted as a bid package to the United States. *See generally* Carahsoft, Public Sector Markets We Serve, https://www.carahsoft.com/markets ("Alongside our vendor and reseller partners, Carahsoft provides leading IT solutions that support various public sector markets in the U.S.") (last visited July 19, 2023).

22.     Carahsoft "employs over 2,000 professionals."   *See* About Carahsoft, https://www.carahsoft.com/about (last visited July 19, 2023).  More than two dozen employees were involved in the sale of ▆ technology solutions.  Since serving CID No. 22-498 on Carahsoft, the United States has identified for Carahsoft at least 24 employees who were involved in the sale of the technology solutions and are expected to have documents that are responsive to the CID.  Carahsoft has not produced emails for any employee.

23.     Since receiving the CID, Carahsoft has identified only one employee not previously identified by the United States as a custodian of responsive documents.  Still, Carahsoft has not

produced any custodial documents even for that single employee.

24. The CID seeks documents from 2014 forward. (Ex. 1-B, Attach. B, at 7.) According to USAspending.gov, a public website that "is the official open data source of federal spending information," from fiscal year 2014 to fiscal year 2023, Carahsoft received over 600 federal contract awards for ▬-branded technology solutions alone for which the federal government paid Carahsoft over $990,000,000. *See* USASpending.gov, https://www.usaspending.gov/search/ ?hash=87c458e 51792535566634a3a43c35970.

25. Also, the $990 million in federal payments to Carahsoft does not include the federal government payments to other resellers who bought ▬ technology solutions from Carahsoft and paid Carahsoft as a distributor for ▬ ant its affiliates. For example, according to USAspending, another reseller received over 200 federal contract awards for ▬-branded technology solutions, resulting in federal payments of over $1,143,000,000 between fiscal year 2014 and fiscal year 2023. For many years during that time period, Carahsoft was the sole distributor of ▬ technology solutions, which required other resellers to go through Carahsoft for sales to the federal government. This means that Carahsoft received a substantial portion of the $1.1 billion that the federal government paid to just that one reseller.

26. In light of the fact that the United States has spent over $2 billion on ▬ technology solutions since 2014, that the DoD was among the largest purchasers within federal agencies, and that Carahsoft was the direct reseller or the distributor on a substantial number of the contracts, the United States reasonably believes that Carahsoft is in possession, custody, control, or knowledge of no less than tens of thousands of documents that are responsive to CID No. 22-498.

**Carahsoft Has Failed to Comply with CID No. 22-498**

*Carahsoft Has Not Produced Any Emails in Response to CID No. 22-498*

27.     After serving CID No. 22-498, counsel for the United States and counsel for Carahsoft had multiple communications by telephone, emails, and letters in an attempt for the United States to clarify (if and where necessary) what the CID was asking for, negotiate the scope of the requests, determine the volume of records that were potentially responsive, prioritize among voluminous records, set a schedule of production, and facilitate Carahsoft's compliance with the CID.

28.     In my experience, including approximately 15 years of practice and over seven years at the DOJ, an investigation involving hundreds, if not thousands, of transactions that resulted in over $2 billion in federal payments can be expected to generate voluminous records. As such, it is especially important to discuss the parameters of document and information requests at the outset, including to determine the adequacy of compliance, whether and what reasonable accommodations are required to lessen the burden of a CID response, whether and how long to extend the deadlines for responding, and how to prevent waste of limited time and resources in the fact gathering process, among other reasons.

29.     At the outset, my co-counsel and I informed Mr. Conway by telephone that the United States was amenable to receiving responsive documents on a rolling basis, typically biweekly, depending on the volume of responsive documents, and contingent on reaching an agreement regarding Carahsoft's process for complying with the CID.  We acknowledged that if Carahsoft acted diligently to comply with the CID, it may need more than the 30 days allotted to produce all responsive documents and agreed to production on a rolling basis.  But we did not agree for Carahsoft to simply suspend production and fail indefinitely to produce the documents

responsive to the CID.

30.   Likewise, I informed Mr. Conway at the outset that the United States was amenable to extending the 20-day deadline for submitting Carahsoft's written responses to the interrogatories, subject to an agreement about Carahsoft's compliance with the CID.  However, we never agreed for Carahsoft to refuse to answer at all or suspend its response indefinitely.

31.   On June 1, 2022, or soon thereafter, also by telephone, in an effort to assist Carahsoft to identify the most easily accessible documents and begin to produce documents in response to the CID, I identified four employees for Carahsoft to prioritize as custodians in the first instance.  I made clear to Mr. Conway that the CID seeks responsive documents beyond these four custodians and that Carahsoft was responsible for identifying other employees that were within the scope of the CID and had responsive documents.

32.   In an effort to further assist Carahsoft in responding to the CID, I urged Mr. Conway to provide information regarding Carahsoft's response efforts, including the list of custodians, the types and sources of documents to be collected, volume of documents extracted or collected, list of search terms, search hit report, and schedule of review and production.  As in other cases, I sought this information to assess the quality of the compliance efforts and to negotiate the scope of responsive materials as necessary to promote efficiency.  Initially, Mr. Conway said that Carahsoft would consider providing this information, but he would later decline by asserting indiscriminately Carahsoft's CID compliance efforts, including "search terms and a hit list of search terms, to be Work-Product of counsel and not subject to disclosure to DOJ." (Ex. 9, at 2.)

33.   Since the CID was served, however, Carahsoft has produced only 2,650 documents in two production tranches.  The first tranche consisted of 2,647 documents, which according to

Mr. Conway, included an employee's "notebook, various agreements, ESI[1] documents, the ESI BPA, and the Order documents from 2013 through 2019." *See* Email from R. Conway, Counsel for Carahsoft, to J. O'Connor, S. Asiyanbi, V. Vaccarella, & B. Venegas, DOJ, Fraud Section (Oct. 31, 2022), attached hereto as Exhibit 3. The second tranche contained just three spreadsheets of text messages for three of the four employees that the United States asked Carahsoft to prioritize.

34. Despite promises to do so, Carahsoft has not produced any email communications, the transaction records at issue (including solicitations, specifications, quotes, bids, proposals, purchase orders, invoices, and task or delivery orders), all hard copy materials for relevant custodians, and all text messages and other communications that are available.

35. On September 30, 2022, Mr. Conway wrote that Carahsoft has "so far located approximately 5000 emails that may be candidates for production, depending on the relevancy of their content. These emails are being reviewed now." Letter from R. Conway, Counsel for Carahsoft to S. Asiyanbi & V. Vaccarella, Trial Attorneys, DOJ, Fraud Section, 2 (Sept. 30, 2022), attached hereto as Exhibit 4. Even though this appears to be only a fraction of the emails required by the CID, to date, Carahsoft has not produced any of the "approximately 5000 emails."

36. On January 3, 2023, Mr. Conway notified the United States by email that "I expect to produce to the Department [of Justice] a large number of emails under the Carahsoft CID in the next week or so." *See* Email from R. Conway, Counsel for Carahsoft, to S. Asiyanbi, V. Vaccarella, & J. O'Connor, DOJ, Fraud Section (Jan. 3, 2023), attached hereto as Exhibit 5. To

---

[1] In this context, ESI refers to Enterprise Software Initiative, which "is an official DoD initiative sponsored by the DoD Chief Information Officer (CIO) to lead in the establishment and management of enterprise COTS [commercial off-the-shelf] IT agreements, assets, and policies." DoD ESI Overview & History, (Sept. 23, 2016), https://www.esi.mil/contentview.aspx?id=720. Essentially, the DoD ESI is the vehicle that the DoD uses to purchase software, including ▌ technology solutions.

date, Carahsoft has not produced any of these emails.

***Carahsoft Has Refused to Identify Custodians with Relevant Documents***

37. The United States has asked on multiple occasions, but Carahsoft has refused to describe its process for responding to the CID, including identifying the custodians who have documents that are responsive to CID No. 22-498.

38. Among other reasons, such information would allow the United States to determine whether Carahsoft was responding meaningfully to the requests, whether a good faith attempt to comply was being bogged down by low priority documents, whether there were other custodians or document sources to prioritize or deprioritize, whether there were categories of evidence that should be collected sooner to prevent dissipation or spoliation, whether there was adequate basis for consenting to an extension of the CID deadlines, and whether any disagreement could be negotiated between the parties or, as here, required court intervention to resolve.

39. On August 2, 2022, I sent an email to Mr. Conway and his colleague, Steve Roman, that "we have not received any information about Carahsoft's process for responding to the CID, including what records (especially electronic records) will be collected, from whom/where, whether and how it will be filtered, and a timeline for production.  It will be helpful to discuss and come to an understanding before substantial effort is undertaken that doesn't address our needs." Email from S. Asiyanbi, Trial Attorney, DOJ, Fraud Section to R. Conway & S. Roman (Aug. 2, 2022), attached hereto as Exhibit 6.

40. On August 8, 2022, Mr. Conway, Mr. Vaccarella, and I had a telephone call in which I reiterated this concern and raised others in an attempt to find common ground for resolving them.

41. During the August 8 telephone call, Mr. Conway explained that Carahsoft was

collecting agreements, orders, invoices, and related documents between Carahsoft and ▮ and/or ▮ resellers in order to respond to the CID. He further explained that Carahsoft planned to focus on email collection next, and while he did not yet know, he expected that the volume of emails would be significant.

42. On September 19, 2022, Mr. Vaccarella and I sent a letter to Mr. Conway, where we explained: "We have asked for a list of the relevant custodians (other than the four that we identified on our own), the sources of records being collected, the volume of records for each custodian from each source, search terms (if any) being used to filter the records, and the search hit report to determine whether the search terms are adequate to identify responsive materials." Letter from S. Asiyanbi & V. Vaccarella, Trial Attorneys, DOJ, Fraud Section to R. Conway, Counsel for Carahsoft, 3 (Sept. 19, 2022), attached hereto as Exhibit 7. We continued, "On custodians, for example, there are additional individuals with responsive communications other than the four initially identified . . . ." *Id.*

43. Mr. Conway responded in a letter dated September 30, 2022, that "[t]he four primary document custodians are the ones that you have identified to us, Mr. Christian Gaines, Mr. Steven Hand, Mr. Patrick Gallagher, and Mr. Craig Abod. Additionally, Mr. Michael Moore of the Carahsoft IT group would qualify as a document custodian." *See* Ex. 4, at 2. By this response, Mr. Conway confirmed that Carahsoft was solely focused on the four custodians identified by the United States and one IT personnel.

44. Mr. Vaccarella and I sent a reply on October 28, 2022, that "[w]e find it difficult to understand why Carahsoft has not identified other individuals, both current and former employees, who communicated internally about the subjects of the CID . . . ." Letter from S. Asiyanbi & V. Vaccarella, Trial Attorneys, DOJ, Fraud Section to R. Conway, Counsel for Carahsoft, 2 (Oct. 28,

2022), attached hereto as Exhibit 8.  We wrote that "[w]e were already aware of several individuals who had such communications" and listed 20 Carahsoft employees by name.  *Id.*  We further noted that "[t]hese custodians should have been included in your collection and searches and others should have been identified by Carahsoft as part of its response to the" CID.  *Id.*  We told Mr. Conway that "we [were] open to prioritizing among custodians," but "we cannot reasonably engage in such process when the universe of custodians remains undeveloped and Carahsoft has not provided information about the roles or functions of custodians to shed light on the documents they have."  *Id.*

45.     On November 18, 2022, Mr. Conway replied that Carahsoft does "not agree than [sic] any person who receives only one email or only one text since 2014 is a document custodian per se.  We believe that your definition of document custodian is much too broad and would place undue burdens on Carahsoft.  Your understanding of the term document custodian would make any recipient of any text or email at any time back to 2014, no matter how irrelevant, a document custodian under CID No. 22-498, which is not reasonable."  Letter from R. Conway, Counsel for Carahsoft, to S. Asiyanbi, Trial Attorney, DOJ, Fraud Section, 1-2 (Nov. 18, 2022), attached hereto as Exhibit 9.  Notwithstanding the protestation, Mr. Conway said Carahsoft would "review the 20 persons listed on page 2 of your letter to determine which communications, if any, they had concerning the items your letter lists, as well as any other allegedly responsive materials."  *Id.* at 2.

46.     Since Carahsoft was refusing to identify all of its employees who have documents responsive to the CID, the United States could attempt to do so on its own.  However, Carahsoft also refused to provide the information requested in the CID, information which the United States could use to identify those custodians.  During this time period, Mr. Conway informed the United

States that Carahsoft did "not generate formal Organization Charts," (Ex. 9, p. 1), which would be responsive to Document Request No. 1 of CID No. 22-498, and which the United States sought as an alternative source for identifying relevant custodians.

47. Similarly, Document Request No. 4 asks for documents sufficient to identify the Carahsoft employees that were involved in the government contracting at issue here. (*See* Ex. 1-B, Attach. D, at 11-12.) Interrogatory Nos. 2 and 4 require Carahsoft to provide lists of employees who were involved in negotiating the agreements, partnerships, or contracts at issue. *Id.* at 10. Carahsoft has not responded to any of these requests.

48. All of these are alternative sources for identifying relevant custodians. But, here, Carahsoft has refused to identify the custodians on its own, while also refusing to produce the relevant documents or provide the necessary information that the United States can use to identify them.

49. By contrast, in 2019, in an unrelated matter regarding Carahsoft's interactions with a different technology solution manufacturer (███ rather than ███ the government asked for and Carahsoft provided the same basic information regarding organization chart/custodians demanded by CID No. 22-498. In that unrelated matter, Carahsoft was also represented by Mr. Conway at Blank Rome, as in the present case. In February 2019, "in response to [an] email requesting an organization chart for Carahsoft Technology Corp.," Mr. Conway replied, "I am attaching to this letter a CD containing a list of the Carahsoft individuals who have differing responsibilities concerning the Carahsoft relationship with ███ Their differing responsibilities are spelled out on the list." Letter from R. Conway, Counsel for Carahsoft, to Kathleen Kohl, Asst. Counsel, OIG, GSA (Feb. 26, 2019), attached hereto as Exhibit 10.

50. With respect to the present CID, however, Carahsoft has obstinately refused to

provide this basic information from which the United States could identify custodians of relevant information, while Carahsoft was also refusing to do so on its own.

***Carahsoft Promised to Produce but Has Not Produced Transaction Records***

51. CID No. 22-498 also seeks records relating to bids, prices, quotes, declinations, and payment records relating to Carahsoft's sale of ▇ software solutions and services to the DoD.

52. The first tranche of Carahsoft's production includes some of these documents, including "Order documents from 2013 through 2019." (*See* Ex. 3.) But, as further explained here, these records are incomplete for that time period.

53. On October 31, 2022, Mr. Conway notified the United States that Carahsoft was "about to provide reworked 2019 order documents as pages CS17113-CS22074." (*See* Ex 3.) Carahsoft has not produced these documents.

***Carahsoft's Production of Text Messages is Incomplete***

54. The United States received the second tranche of Carahsoft's production on November 14, 2022, consisting of three "Excel spreadsheets of text messages concerning" three of the four priority custodians identified by the United States. Email from R. Conway to S. Asiyanbi, V. Vaccarella, J. O'Connor, & B. Venegas, DOJ, Fraud Section (Nov. 14, 2022), attached hereto as Exhibit 11.

55. Mr. Conway further advised in this cover email that (a) "Carahsoft is continuing to search for other relevant text messages" and (b) they "are sending these Excel Spreadsheets to John O'Connor [who is the e-discovery manager for the Department of Justice, Commercial Litigation Branch (Fraud Section)] for processing." *Id.*

56. Since then, Carahsoft has not produced or informed the United States of any additional text messages, nor has it produced even the meager three Excel files in a manner that is

consistent with the ESI Instructions. Moreover, two of the three Excel files in its production appear incomplete. Carahsoft has produced no text messages at all for the fourth priority custodian.

57. One of the three spreadsheets contained 4,068 text messages to and from one employee. According to his LinkedIn profile, the employee started at Carahsoft in May 2016. The text messages in Carahsoft's production span from December 2017 to August 2022. While the United States does not know whether this file is complete, we recognize that the text messages produced for this custodian are significantly broader in time and larger in volume than the text message productions for the other two custodians.

58. The second spreadsheet contained only 272 text messages to and from another Carahsoft employee. The messages span only three months—May, August, and December 2020—even though the employee worked for Carahsoft throughout the entirety of the time period covered by the CID (from 2014). There are no text messages produced, nor did Carahsoft provide any explanation for the absence of messages for any other time period.

59. The third spreadsheet contained only 26 messages to and from a third Carahsoft employee. According to his LinkedIn profile, this employee started at Carahsoft in January 2011. However, the paltry 26 messages only started from July 19, 2022, which was approximately three weeks after law enforcement agents contacted this third employee for an interview and only 18 days after the United States served the employee (through Carahsoft) with a separate CID for his oral testimony. Carahsoft has not produced text messages for this employee for the time period before July 19, 2022, nor has it provided any explanation for the absence of messages prior to that date.

60. Carahsoft has not produced any text messages for the fourth priority employee/custodian, who owns the company, nor has it produced text messages for the IT

personnel that it included as the fifth custodian. Carahsoft has provided no explanation for the absence of or delay in producing the messages.

61. Carahsoft's production of the three files containing text messages is also deficient in other important ways. As further described below, Carahsoft did not produce the files in a manner consistent with the ESI Instructions. For example, the Excel files are not Bates labeled and do not contain other information that Carahsoft is required to include with the production of text messages or for producing data extracted from smart phones.

62. According to the ESI Instructions, Carahsoft "shall identify, collect, and produce any and all data which is responsive to the requests which may be stored in audio or video recordings, cell phone/PDA/Blackberry/smart phone data, tablet data, voicemail messaging data, instant messaging, text messaging . . . ." (Ex. 1-C, § 13, at 12.) Under further instructions, "[m]essages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text." *Id.* In short, while text messages may comprise the large bulk of information that is extracted from smart phones, the CID requires collecting "all data" and, as further described below, producing the data "to align with the formats listed in section 2" of the ESI Instructions.

63. While Mr. Conway stated in his November 14 email that Carahsoft was "continuing to search for other relevant text messages," (*see* Ex. 11), Carahsoft has not produced any additional text messages or provided any information regarding its efforts.

***Carahsoft Has Failed Across the Board to Comply with ESI Instructions***

64. We have provided the ESI Instructions to Carahsoft on five separate occasions. The instructions are compiled in a 19-page document that describes the manner and method for producing different types of documents in response to the CID, including emails, attachments,

documents in Word, Excel, or PowerPoint format, hard copy documents, and other forms of electronically stored information. The ESI Instructions included guidance for the production of messages and data from smart phones and other devices. (*See* Ex. 1-C, § 13, at 12) (Carahsoft "shall identify, collect, and produce any and all data which is responsive to the requests").

65. CID No. 22-498 required Carahsoft to "produce imaged hard copy and electronic documents according to the attached [ESI Instructions]." (*See* Ex. 1-A, Attach. B, ¶ 10, at 9.)

66. Furthermore, "ESI shall be produced in a manner which is functionally usable by the government." (Ex. 1-C, § 21, at 17.)

67. The ESI Instructions required Carahsoft to produce documents with all of the data that is original to and available with each document (e.g., author, custodian, editor, dates, etc.), as well as data that may further assist in identifying each document (such as Bates numbers, parent/attachment association, etc.) for evidentiary use. (*See* Ex. 1-C.)

68. For these reasons, section 3 of the ESI Instructions described the "Required Metadata/Database Field" that "should be present in the load file produced" in response to the CID. It listed 49 specific metadata or database fields, while indicating the subset of the 49 fields that applies to each document type, such as for hard copy documents, emails, or "other ESI." (Ex. 1-C, § 3, at 4-9.) Some of the fields included the name of the company producing the records, name of custodian, document author, Bates numbers, page count, file path, etc. *Id.* A vast majority of these fields consisted of properties that are original to and ordinarily associated with each electronic file, which means that a producing party merely has to extract the properties or fields from the documents and provide the extracted fields in a file that is included with its production.

69. The ESI Instructions further directed that "[a]ny modifications or deviations from the Production Specifications may be done only with the express permission of the government

and these modifications or deviations should be communicated to the government and approved by the government in written form." (Ex. 1-C, § 1, at 1.) Carahsoft did not request any modification, and none has been approved by the government in writing.

70. Despite the foregoing requirements and set of facts, none of Carahsoft's production of 2,650 documents comply with the ESI Instructions. The first tranche included only four fields, while omitting several others. The second tranche was produced without any fields at all. And Mr. Conway has declared that "Carahsoft is under no obligation to provide this data to the department in the exact form requested by the government." (Ex. 4, at 2.)

71. In Carahsoft's email of October 31, 2022, Mr. Conway confirmed that the documents in the first tranche of production included only "the four fields," while erroneously declaring that those were the only fields "that [the government] have requested." *See* Ex. 3.

72. On the same day, October 31, John O'Connor replied in an email that I was copied on that the United States "did not request [only] four fields. In my email of August 30, I discussed four <u>folders</u> that are routinely associated with data that is processed in accordance with our ESI specs," referring to the ESI Instructions. Email from J. O'Connor, DOJ, Fraud Section to R. Conway, Counsel for Carahsoft, (Oct. 31, 2022), attached hereto as Exhibit 12. Mr. O'Connor attached another copy of the ESI Instructions and reaffirmed that "[w]e request all available fields, not just the four you produced (Begin Bates, End Bates, Pages, NativePath)." *See id.*

73. In choosing these four fields, Carahsoft omitted fields that were original to the documents, including custodian, author, dates of creation and/or revisions, and other vital fields that it could have reasonably extracted from the documents.

74. Indeed, on multiple occasions, the United States urged Mr. Conway to permit direct dialogue between the electronic discovery personnel for the Fraud Section of the DOJ and at his

law firm in order for both sides to discuss and resolve the technical issues that made Carahsoft's production noncompliant with the ESI Instructions. But Carahsoft refused every overture and did not permit the direct dialogue, without remedying the noncompliance.

75. In my August 2, 2022, email to Mr. Conway, I wrote, "it's best to get the litigation support personnel on both sides on the phone to talk and iron out any disconnect. As you can imagine, we receive production[s] from Blank Rome frequently and don't encounter these problems in the normal course." (*See* Ex. 6.) This request went unheeded.

76. On August 30, 2022, Mr. O'Connor emailed Mr. Conway, copying me and others, and asked Mr. Conway to put him "in touch with your e-discovery vendor or in-house processing manager" in order to resolve the technical deficiencies in Carahsoft's production. *See* Email from J. O'Connor, DOJ, Fraud Section to R. Conway, Counsel for Carahsoft (Aug. 30, 2022), attached hereto as Exhibit 13. This request went unanswered.

77. In our September 19, 2022, letter, I again referred to these repeated attempts to facilitate compliance, calling out Carahsoft's failure to "respond to the request for direct communication between the technical experts that could more easily resolve the" technical deficiencies in Carahsoft's productions and noncompliance with the ESI Instructions. (*See* Ex. 7.)

78. Mr. Conway refused or ignored multiple requests for direct communication to resolve the technical issues that rendered Carahsoft's productions noncompliant with the CID requirement to produce documents in the manner prescribed by the ESI Instructions.

79. All of Carahsoft's productions are noncompliant. Carahsoft is aware of the noncompliance, and it has not corrected this problem.

**Carahsoft Has Failed to Comply with CID No. 22-498**

80. To date, Carahsoft has failed to produce to the United States any of the documents requested by CID No. 22-498, except the 2,650 documents described in ¶¶ 33 and 70.

81. To date, Carahsoft has failed to produce to the United States any answers to the interrogatories in CID No. 22-498.

82. To date, Carahsoft's production has failed to comply with the ESI Instructions, as required by CID No. 22-498.

83. To date, Carahsoft has failed to produce to the United States any sworn certificate of compliance with the interrogatories in CID No. 22-498.

84. To date, Carahsoft has failed to produce to the United States any sworn certificate of compliance with the document requests in CID No. 22-498.

85. To date, Carahsoft has neither complied with, nor petitioned to modify or set aside, CID No. 22-498.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: July 19, 2023
Washington, D.C.

SAMSON ASIYANBI
Digitally signed by SAMSON ASIYANBI
Date: 2023.07.19 12:57:29 -04'00'

SAMSON O. ASIYANBI
Trial Attorney
Commercial Litigation Branch
United States Department of Justice