IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| The United States of America, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 1:23-CV-01999-RDB |
| v. | : | |
| | : | |
| Carahsoft Technology Corp., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

**<u>UNITED STATES' REPLY TO DEFENDANT CARAHSOFT TECHNOLOGY CORP.'S RESPONSE TO THE PETITION OF THE UNITED STATES TO ENFORCE CIVIL INVESTIGATIVE DEMAND NO. 22-498</u>**

**INTRODUCTION**

On July 26, 2023, the United States filed its Petition to Enforce Civil Investigative Demand ("CID") No. 22-498 (the "Petition") because Carahsoft failed to comply. The United States filed after Carahsoft, through counsel, rebuffed repeated efforts to work together to secure subpoena compliance. Over several months, Carahsoft failed to engage in a good faith effort to locate the documents required by the CID, refused to produce the few it had located, and ultimately stopped complying. Between June 1, 2022, when the CID was served, and July 26, 2023, when the Petition was filed, Carahsoft produced only 2,650 documents and virtually no emails. It had made no production in the eight months before the filing.

Two weeks after the Petition, Carahsoft suddenly produced 13,733 documents, including 11,637 emails and attachments, most of which were documents that it had identified in 2022 but simply did not produce. Still, the production does not include several documents required by the

CID. Carahsoft's belated recent productions and purported plan to comply are insufficient to bring Carahsoft into substantial compliance with the CID for the reasons explained in the Petition and further elaborated herein. As such, the United States respectfully requests that the Court issue the order requiring compliance requested in its Petition.

**BACKGROUND**

In its response to the Petition, Carahsoft complains about the "burden" imposed by the CID. *See* Carahsoft's Response, ECF No. 10 at 4, 11, 19. But prior to filing the Petition, Carahsoft rebuffed the government's attempts to compromise and negotiate the scope of the CID, by asking Carahsoft to draw up and provide a list of its custodians (for prioritizing among them), search terms, and search hits, among other things, *see* ECF No. 1-12 at 4, and to explain its CID response process. Such requests are routine in investigations involving voluminous records in order to separate the wheat from the chaff as early as possible. The benefits tend to be obvious. The process is cooperative and focused. It is efficient in cost and time. No court involvement is required. Here, however, Carahsoft's counsel, Richard Conway of Blank Rome, declined every request for information, negotiation, or collaboration. *See, e.g.*, ECF No. 1-13 at 2.

Over a six-month period, beginning from the service of the CID, Mr. Conway refused to provide meaningful information about Carahsoft's process for responding to the CID; refused to produce documents through electronic file transfer; declined to provide document metadata that would fully identify the sources, control, uses, and authentication of the documents; rejected requests to cure technical problems by simply allowing the e-discovery experts on both sides to talk to one another; and, ultimately, stopped producing documents.

The obstreperousness of this approach became evident after the United States filed this Petition. Since then, Carahsoft has sent productions through electronic file transfer (something it

repeatedly refused to do before) and introduced Blank Rome's e-discovery expert to the government's (a request it previously rejected). Blank Rome's e-discovery expert has had few, if any, questions for the government's e-discovery manager because the government made no unusual request in this matter. Indeed, Carahsoft has now made one production that contains the required metadata.

The United States did not wish to file a Petition, given the government time diverted from pressing matters and the Court's busy docket. The Petition became necessary due to Carahsoft's course of conduct and repeated broken promises. In 2022, when it became apparent that Carahsoft was not going to identify potential document custodians, the undersigned counsel provided a list of 20 that were identified through the government's own efforts. *See* ECF No. 1-12 at 2. Carahsoft responded on November 18, 2022, dismissing the list while also declaring "[i]n the spirit of cooperation, we will review the 20 persons listed on page 2 of your letter to determine which communications, if any, they had concerning the items your letter lists, as well as any other allegedly responsive materials." ECF No. 1-13 at 2. After that, Carahsoft provided no information whatsoever. Importantly, after filing the Petition, the undersigned counsel spoke to Mr. Conway on July 31, 2023, where he confirmed that he had not yet reviewed any of those 20 additional custodians, as he had promised in his November 2022 letter. During that call, he again promised to review the list of 20 additional custodians. He also agreed to provide the government with a list of search terms being used by Carahsoft and to run the search terms against the 20 custodians. More than six weeks later, he has not provided the list of search terms, and it appears that he has not run the terms against the custodians. *See* ECF No. 10 at 13 (stating that Carahsoft is just "*now* searching for emails and documents from the 20 purported document custodians DOJ named.") (emphasis added). The only discernible thing that he has done is

determine that two of the 20 custodians are in fact the same person. *See* ECF No. 10 at 13 n.2.

Likewise, on January 3, 2023, Mr. Conway sent an unsolicited email to inform the government that he "expect[ed] to produce to the Department a large number of emails under the Carahsoft CID in the next week or so." Carahsoft did not produce any documents, however, until after the Petition was filed in July 2023. In a more recent example, on September 7, 2023, after the Petition was filed, Mr. Conway apprised the government that "I expect that we will provide additional information to you in 7-10 days, perhaps earlier, in response to your Office's CID to Carahsoft." More than two weeks later, he has not provided the information.

Rather than accept responsibility for the delay and propose an adequate plan for full and prompt compliance, Carahsoft attempts to shift the blame for its noncompliance to the United States, including by asserting "good faith" (six times) without showing the work; by expressing the "spirit of cooperation" (four times) without actually complying; by continuing to challenge the need to provide metadata in accordance with the CID's instructions for producing electronically stored information ("ESI Instructions"); by challenging the government's assertion that Carahsoft should have tens of thousands of responsive documents when it has not collected documents for most custodians; and by unconvincingly seeking to shift the blame to DOJ for not doing more to police its noncompliance.

Fortunately, Carahsoft has begun to do some of the things it refused to do before the Petition was filed. But because (1) Carahsoft continues to make but not keep promises, (2) Carahsoft remains substantially noncompliant with the CID, (3) Carahsoft's proposal for compliance will not result in the location, collection, and production of the tens of thousands of documents required by the CID, and (4) Carahsoft cannot be trusted to timely and voluntarily comply, the United States continues to seek an order of compliance from this Court.

## ARGUMENTS

### A. Carahsoft Remains Substantially Noncompliant With the CID, and Its Proposal Will Not Bring It into Compliance.

<u>*Carahsoft's Current Production is Glaringly Noncompliant*</u>

Recently, on a September 22, 2023, teleconference call with Mr. Conway, he informed the government that Carahsoft's production of 11,637 emails and attachments constitutes **all** of the non-privileged emails and attachments for the five initial custodians from 2014 to 2022. An initial assessment of the production, however, reflects glaring and substantial gaps. Carahsoft produced only 34 documents mentioning one of the custodians, Craig Abod (including only one solitary email sent by him), and none mentioning Michael Moore, who is the only custodian recommended by Carahsoft. It produced only 354 documents mentioning a third custodian, Patrick Gallagher, who was Carahsoft's Vice President of Enterprise Solutions during most of the relevant period. Carahsoft produced only 21 emails sent by him. Similarly, a word search for a government solicitation (no. SP4701-20Q-0103) or its project name yielded a paltry 40 documents, including just four emails, even though Carahsoft submitted the winning bid of over $170 million. A word search for important solicitations yielded zero documents for three (including SP4701-19-Q-0042, SP4701-19-Q-0054, and SP4701-20-Q-0003) out of seven selected at random. Given these many, non-exhaustive gaps, it boggles the mind that Carahsoft would suggest, as it does uncritically, that it "has substantially complied with the requirements of the CID." *See* ECF No. 10 at 18.

In its response, Carahsoft nevertheless offered to do the following in order to comply:

1. "Search for, and produce, all responsive emails and documents sent between the nineteen" custodians;
2. "Search for, and produce, all responsive text messages for all messages sent between" only three custodians and 64 contacts or counterparties; and
3. "Search for, and produce, all internal Carahsoft emails and documents that are

responsive."

ECF No. 10 at 19. For the reasons explained below, these proposals will not result in the location, collection, and production of all documents requested by the CID. If Carahsoft is not ordered to locate and collect the documents demanded, it will continue to maintain that it has "substantially complied" based on what it has done but not based on what the CID requires.

*Documents and Emails*

Before the Petition, Carahsoft would only commit to collecting documents for five custodians, although it declined to provide a meaningful explanation of its process beyond that. Its post-Petition proposal to collect and produce documents for 19 additional custodians is a marked improvement. But Carahsoft's legal obligation to respond to the CID is not only quantitative but also qualitative. As such, proposing to produce documents for 19 custodians that the United States surmises have relevant information, without determining whether those individuals are the right custodians, or that 19 is the right number of custodians does not meet the qualitative requirements for compliance.

The Court should enter an order requiring CID compliance notwithstanding Carahsoft's proposals given the inadequacy of its process, as explained in its response and further confirmed by Mr. Conway during the recent telephone call on September 22, 2023. During that call, Mr. Conway represented that Carahsoft has completed its production of non-privileged communications for the initial five custodians and that its proposal would only affect the 19. That made it clear—and counsel confirmed—that Carahsoft's proposal to "[s]earch for, and produce, all internal Carahsoft emails and documents that are responsive," (ECF No. 10 at 19) is in fact limited to the 19 additional custodians and would do little, if anything at all, to fill the gaps described above (e.g., producing only 34 documents that mentioned (and only one email

sent by) Craig Abod, producing no document that mentioned Michael Moore, and producing 354 documents that mentioned Patrick Gallagher). Abod and Gallagher, together, should have thousands of documents, even after deduplication. There are several thousands more for the other two—Christian Gaines and Steve Hand—that Carahsoft has not collected. Carahsoft's proposal, as further explained by Mr. Conway, will address none of these deficiencies.

As to the 19 additional custodians, the undersigned counsel has asked for (but not received) their employment dates, titles or positions, to whom they reported, and other personnel information that is required by Instruction No. 13, Interrogatory Nos. 2 and 4, and Request Nos. 1 and 4 of the CID. *See* ECF No. 1-4. With such information, both sides can *qualitatively* determine who should be included or excluded from the list of custodians. A simple search for 19 custodians without determining whether they are the relevant 19 or that 19 is the relevant number is inadequate and would not be compliant.

Moreover, the document collection process described by Carahsoft provides further evidence for why its production was deficient in the first place and will continue to be deficient, unless ordered by the Court to correct course. In its response, Carahsoft described its "four searches to identify and capture the different categories of information sought by the CID." ECF No. 10 at 12. It explained that it asked individual employees to "personally search" for certain documents and tasked its head of IT Michael Moore to search their mailboxes. *See* ECF No. 10 at 15-16. The collection attributed to its head of IT resulted in the production of emails that, as described above, omitted documents and communications for some custodians, including himself (assuming he has relevant communications). This process has proven woefully deficient, and Carahsoft cannot continue to rely on it to satisfy its obligation under this CID.

Also, tasking non-legal employees without technical knowledge or training to "personally

search" for electronic documents is an unreliable way to capture possibly thousands of documents over multiple years. Each employee is likely to conduct the "personal[] search" in a different, inconsistent manner. Each is likely to search different files or folders, even with best efforts, while inadvertently omitting other folders. Documents in deleted files or folders are unlikely to have been searched at all. If the storage media contained storage spaces that are not visible to someone who did not have an administrator-level access, such spaces would not have been searched at all. This is why it is best practice to take an image of computers, hard drives, email servers or folders, and cell phones, thereby automating and collecting the data in a technically sound manner. Carahsoft's process was anything but. They were inconsistent and unreliable. This Court should reject outright any proposal to search or collect documents in a manner that is not technically sound, that is inconsistent across custodians, that omits necessary custodians, or that includes unnecessary custodians for the sake of appearance.

Despite the government's explanation before, with, and after the Petition, Carahsoft continues to demand "further explanation" for the government's estimate that it should have tens of thousands of documents, while insisting that it "was not uncovering such a large volume of documents." ECF No. 10 at 12. As already explained, its process was not designed to fully respond to the CID and that may explain its befuddlement. The size of the market here alone—involving over 600 federal contracts awarded to Carahsoft and over $990,000,000 in direct payments from the federal government—demonstrates the logic of the estimate. *See* ECF No. 1-2 at ¶ 24. Likewise, Carahsoft admitted having "over 20 million emails" on the subject matter of this investigation, albeit including its commercial business. *See* ECF No. 10 at 17. If so, an estimate of tens of thousands, out of 20 million, would appear very conservative.

Carahsoft's insistence that it "was not uncovering such a large volume of documents" is

not merely unreliable, it is an omen of what is to come if the Court does not intervene to enforce this CID. It telegraphs that, without Court intervention, Carahsoft cannot be trusted to search for additional documents for the initial custodians, who are among the most important in this matter. It confirms that, without Court intervention, Carahsoft would rely on a search or collection process that has already proven deficient in the many documents it has failed to locate so far. And, without Court intervention, Carahsoft would rely on the efforts of the head of IT who "searched the mailboxes of Steven Hand and Christian Gaines and searched for all emails sent to or received from the resellers," (ECF No. 10 at 13), but apparently did not search the email boxes of the remaining three of the five initial custodians, including himself. The result would not be compliant, and we are likely to be back before the Court.

*Text Messages*

Carahsoft is also promising to "[s]earch for, and produce, all responsive text messages for all messages sent between" only **three** Carahsoft employees and 64 of their business contacts or counterparts. ECF No. 10 at 22. Here, we assume that Carahsoft is proposing to address the missing messages for the three custodians described in the government's declaration. ECF No. 1-2 at 14-16. But the CID does not limit Carahsoft's obligation to three custodians only, and in prior communications with Mr. Conway, he had expressly agreed to prioritize *four* (not three) custodians and had also promised that "Carahsoft is continuing to search for other relevant text messages." *See Id.* at 14. So to the extent that Carahsoft is now unilaterally limiting its obligation and is not seeking to produce the text messages of other custodians, including but not limited to Craig Abod, *see infra*, that is not compliant with the CID.

The Court should also take notice that if there are additional custodians with relevant text messages but whose messages have not been collected for over a year since the CID was served,

there is intolerably high risk that those messages have dissipated and are irretrievably lost. If so, the loss would be attributable to Carahsoft's failure to promptly identify those employees and collect the messages within a reasonable time after receiving the CID and thereby allowing the irretrievable loss of communications demanded by the CID. *See generally Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (recognizing that "intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction."). The "obligation to preserve evidence arises when [a] party has notice that the evidence is relevant in litigation . . . [or] when a party should have known that the evidence may be relevant to future litigation." *Kronisch*, 150 F.3d at 126.

Likewise, Carahsoft has justified limiting its response to the text messages between 64 business contacts and the three Carahsoft employees. *See* ECF No. 10 at 22. We do not know how the 64 contacts were identified, how they are relevant to this investigation, or the salience of the number 64. Since the CID is not so limited, the Court should order Carahsoft to produce all responsive text messages (and other cell phone data, including messages on WhatsApp or Signal, calendar, notes, etc.), regardless of the 64. To be sure, the CID does not seek any personal or non-business communications. The CID only requires the production of communications that are relevant, and that requirement does not hinge on Carahsoft's selection of 64 individuals on the other side of the communications.

<u>Craig Abod</u>

Missing from Carahsoft's proposal for compliance are text messages involving Craig Abod, its president and founder. Mr. Abod is not merely a chief executive that is far removed from the day-to-day operations of the business at issue in the CID. He was personally involved in

creating and directing some of the relationships underlying the government's investigation. Even though Mr. Abod was among the initial four cell phone custodians that the government identified for Carahsoft, Carahsoft omitted him from its current proposal without any explanation or justification. This is a glaring omission that further makes Carahsoft's proposal noncompliant.

*Interrogatories*

Two months after filing the Petition, Carahsoft has still not submitted its interrogatory responses and is proposing to do so "[w]ithin thirty days of [] October 3, 2023." *See* ECF No. 10 at 19. The Court's order should require it to submit all interrogatory responses, as well as certificates of compliance, no later than that date.

### B. Carahsoft Does Not Have a Legitimate Argument Regarding the Scope of the CID.

After refusing to comply with the CID for more than a year, Carahsoft now claims that the "CID document requests are unduly burdensome or unreasonably broad." ECF 10 at 19. As an initial matter, under the False Claims Act ("FCA"), a recipient "may file . . . a petition for an order of the court to modify or set aside" a CID but any such petition "must be filed . . . within 20 days after the date of service of the" CID. 31 U.S.C. § 3733(j)(2)(A)(i). Carahsoft did not timely file a petition to modify or set aside the CID and, frankly, is not seeking such relief here. For that reason alone, its argument should not be entertained. *See United States v. Cross Senior Care, Inc., LLC*, No. 8:19-mc-8-T-33TGW, 2019 U.S. Dist. LEXIS 235272, at *15 (M.D. Fla. Nov. 6, 2019) ("The intent of the statute would be minimized, if not rendered meaningless, if the respondent could circumvent the time limitations for objections set forth in 31 U.S.C. 3733(j)(2). Therefore, the respondent waived its right to object to [CID] request no. 21.").

In any event, its argument about scope crumbles under its own weight. *See id* (considering "respondent's objections" and finding "they are unmeritorious."). On the one hand,

Carahsoft incomprehensibly argues that the "requests . . . are so vague and overbearing as to be irrelevant and useless." ECF No. 10 at 21. But in the very next sentence, it declares that "Carahsoft has substantially complied with the requirements of the CID, and will continue to do so." *Id.* In no instance did Carahsoft seek clarification of any request (other than to summarily allege that certain requests are overbroad). And it proposes to produce other outstanding documents within 14 to 30 days from October 3, 2023, which presumes an understanding of what to produce. *Id.* at 22. Moreover, upon filing the Petition, Carahsoft produced 13,733 documents (in two tranches of 2,096 and 11,637 documents). These hardly reflect the actions of a party that is confronting a vague and overbroad CID or a CID that is unduly burdensome for "a Government Information Technology . . . Software Provider." *See* ECF No. 10 at 1.

Even assuming without conceding that Carahsoft had difficulties interpreting the CID requests, the undersigned counsel made repeated overtures to Carahsoft to negotiate the scope. *See* ECF No. 1-12 at 4. The United States identified on the face of the CID what it was investigating, namely whether certain enumerated technology solutions companies, "various resellers, including Carahsoft Technology Corp., conspired to make, made, or caused to be made false claims to the Department of Defense by coordinating the bids, prices, and/or market for [a specific technology] software, cloud storage, and related hardware and services," ECF No. 1-4 at 1, and made repeated overtures to work with Carahsoft on searching for responsive materials. Counsel for Carahsoft declined every time and ultimately declared that Carahsoft was not obligated to provide any information about its compliance efforts and asserted information regarding its compliance, including "search terms and a hit list of search terms, to be Work-Product of counsel and not subject to disclosure to DOJ." ECF No. 1-13 at 2. Such information, had it been provided, would have been used to resolve any questions regarding CID scope.

Carahsoft relies primarily on two cases regarding the scope of subpoenas. Both are inapposite, and neither helps its cause. Carahsoft cites *Servitron, Inc. v. Interstate Commerce Comm.*, 380 F. Supp. 1344, 1347 (M.D. La. 1974). *See* ECF No. 10 at 20. The *Servitron* case, however, involves an investigative subpoena to a **third party**, unlike the CID issued to Carahsoft, who is itself under investigation, as the CID states on its very face. Moreover, the very next sentence in the *Servitron* order declares that a government agency "does have the right to obtain evidence from anyone whomsoever of things relating to the matter properly under its investigation," *Servitron*, 380 F. Supp. at 1347, and that followed from an earlier declaration that "[t]he testimony and the documents sought need not necessarily even be admissible as evidence any more than is any other discoverable material under the Federal Rules of Civil Procedure. It need only to relate to the matter under investigation." *Id.*

Carahsoft also cites *J. White, L.C. v. Wiseman*, No. 2:16-cv-01179-CW-JCB, 2020 U.S. Dist. LEXIS 115720, *4 (D. Utah June 29, 2020). *See* ECF No. 10 at 17. *Wiseman* was a private lawsuit, where the plaintiffs "served a subpoena duces tecum on [a] non-party." *Wiseman*, 2020 U.S. Dist. LEXIS 115720, at *2. In the context of a third-party subpoena issued under the Federal Rules of Civil Procedure, not a CID to an entity under FCA investigation, the court opined that certain "requests **may be** facially overbroad" based on certain phrases. *See id.* at *4 (emphasis added). It did not hold that requests using such languages **are** automatically facially overbroad. Substance and context matter, and the scope of the CID is cabined by its purpose, among other factors.

### C. Carahsoft's Arguments Regarding Complying with the ESI Instructions Defy Logic.

A large number of documents in Carahsoft's production remain noncompliant with the CIDs' ESI Instructions. This includes the 2,650 documents that Carahsoft produced prior to the

Petition, as well as 2,096 documents produced *after* the Petition. Neither sets of documents include any metadata that indicates how the documents were kept in their ordinary course of business, including but not limited to the author, custodian, file name, file path, dates of creation or modifications, etc. In an investigation involving the potential manipulation of bids, prices, and communications, the authorship, use, custody, location, and modifications of documents, among other attributes, are information that is as important as the existence of the documents. As such, metadata is among the "***information*** relevant to a false claims law investigation" that the FCA authorizes the government to demand. *See* 31 U.S.C. § 3733(a)(1) (emphasis added).

The ESI Instructions simply require providing a select list of metadata (*see* ECF No. 1-5 at § 3) that is available on the documents being produced, as well as prescribing the technical way to produce the documents and data. This is consistent with the process endorsed under Rule 34 of the Federal Rules of Civil Procedure,[1] and a request under Rule 34 to "produce any ESI in .TIFF format with a corresponding load file, **containing metadata field**, is reasonable." *See BalanceCXI, Inc. v. Int'l Consulting & Research Grp., LLC*, No. 1-19-CV-767-RP, 2020 U.S. Dist. LEXIS 46895, at *9 (W.D. Tex. Mar. 13, 2020) (emphasis added) (overruling "Defendants' objections" and ordering "Defendants to produced electronically stored information as noted."). In *BalanceCXI*, the court further explained that "metadata is likely to be important to the case," where there is "significant issues regarding Defendants' copying and deleting files." *Id.* at *8-9. Here, too, the transaction records, pricing decisions, and any copying and deleting of files—and the underlying metadata—are important to the existence or non-existence of a conspiracy to

---

[1] Fed. R. Civ. P. Rule 34(b)(1)(C) expressly allows a civil litigant to "specify the form or forms in which electronically stored information is to be produced." So it is far from controversial that the government can also specify, under statutory authority to demand "information," the manner, forms, and types of ESI information to be produced.

defraud the United States through bid rigging and overcharging.

Not surprisingly, Carahsoft's protest against complying with the ESI Instructions does not make mention of any burden, let alone ***undue*** burden, with providing available metadata. It cannot. The ESI Instructions require the production of information and in the same manner that a well-resourced CID recipient like Carahsoft and one who is represented by a national law firm like Blank Rome would have received, stored, and reviewed the documents internally. This is the manner in which Blank Rome routinely produces documents to the government other matters. Even Carahsoft has now made at least one production with metadata. So the curious choice to continue to challenge a rather basic and unremarkable request to provide the metadata on the documents being produced only underscores the need for the Court to enter an order enforcing this CID.

To bring its productions into compliance here, Carahsoft need only provide an overlay—which is the e-discovery term for a spreadsheet containing supplemental data—to add to its production. There is no need to reproduce the documents. Therefore, the burden required to comply is minimal at best.

## CONCLUSION

For the foregoing reasons, the United States respectfully asks this Court to enter an Order for the relief requested in its Petition.

September 26, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EREK L. BARRON
United States Attorney

    /s/
MATT HAVEN
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4800
Matthew.Haven@usdoj.gov

JAMIE ANN YAVELBERG
SARA McLEAN
SAMSON O. ASIYANBI
VINCENT J. VACCARELLA
Commercial Litigation Branch
United States Department of Justice
175 N Street, N.E., Suite 9.224
Washington, D.C. 20002
(202) 353-1053
(202) 307-0418
Samson.Asiyanbi2@usdoj.gov
Vincent.J.Vaccarella@usdoj.gov